UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | |
|---|---|
| PAIGE BOVA, | ) |
| | ) |
| Plaintiff, | ) |
| | ) CASE NO 1:20-cv-2999: |
| v. | ) |
| | ) |
| MILLIMAN, INC., | ) |
| | ) |
| Defendant. | ) |

**PLAINTIFF'S COMPLAINT AND DEMAND FOR JURY TRIAL**

**I.   STATEMENT OF THE CASE**

1. Plaintiff, Paige Bova (hereinafter "Paige" or "Plaintiff"), brings her Complaint against Defendant, Milliman, Inc., (hereinafter "Milliman"), for violations of Title VII of the Civil Rights Act of 1964 ("Title VII"), as amended, 42 U.S.C. § 2000e *et seq.* Paige contends she was subjected to discrimination based on sex and a sexually hostile work environment.

**II.   PARTIES**

2. Paige is female who resides within the geographical boundaries of the Southern District of Indiana.

3. Milliman is a Washington corporation with a principal office located in Seattle, Washington, with facilities located in and conducting business within the geographical boundaries of the Southern District of Indiana.

**III.   JURISDICTION AND VENUE**

4. Paige was an "employee" within the meaning of 42 U.S.C. § 2000e(f).

5. Milliman is an "employer" within the meaning of 42 U.S.C. § 2000e(b).

6. Paige satisfied her obligation to exhaust her administrative remedies by having timely filed her U.S. Equal Employment Opportunity Commission Charge Number 470-2020-01568 against Milliman alleging discrimination in violation of the Civil Rights Act of 1964, as amended, because of her sex, female. Paige received her Notice of Right to Sue from the EEOC on August 15th, 2020, and now timely files her Complaint.

7. Jurisdiction is conferred on this Court by Title VII of the Civil Rights Act of 1964; 42 U.S.C. § 2000e-5, 28 U.S.C. § 1331, and 28 U.S.C. § 1343.

8. Venue is proper in this Court pursuant to 28 U.S.C. § 1391 as all events, transactions and occurrences concerning this matter have arisen in the geographical purview of the Southern District of Indiana.

## IV.    FACTUAL ALLEGATIONS

9. Paige was hired by Milliman in January 2018 as a marketing associate.

10. In her role as a marketing associate, Paige assisted Milliman Consultants who provided marketing products and services to clients in the pharmaceutical industry.

11. An employee by the name of Andy Barnes (hereinafter "Barnes") worked as a Consultant at Milliman.

12. Paige worked under the direct supervision of Andy Barnes.

13. Beginning in April 2018, Barnes began making unwanted physical contact of a sexual nature towards Paige including but not limited to inappropriately touching Paige in their weakly one-on-one meetings.

14. Barnes would further make inappropriate and unwanted sexual remarks about Paige's appearance and how she looked in her clothing.

15. These grossly inappropriate and unwanted physical contacts of a sexual nature, and the grossly inappropriate and unwanted sexual remarks created a hostile work environment for Paige.

16. In August 2018, Paige accompanied Barnes to New York City to meet with a client.

17. On their way back home to Indianapolis, Barnes began making comments of a sexual nature to Paige at the airport about how she changed clothes, and about how tight her jeans were on her legs.

18. Their flight back to Indianapolis was delayed, and Barnes began drinking and by the time they boarded the plane, Barnes was intoxicated.

19. As Barnes sat next to Paige on the plane, he began making unwanted physical contact of a sextual nature towards Paige including but not limited to touching her legs and shoulder.

20. In September 2018, Paige again accompanied Barnes on an overnight trip to New York City, and this time they were also joined by a co-worker, Derek Cole (hereinafter "Cole"), a Milliman Consultant.

21. While in New York City, Paige and Cole met Barnes for dinner the evening that they arrived, and by the time Paige and Cole arrived at the restaurant, Barnes was intoxicated, confiding that he met his brother earlier and consumed 5 or 6 drinks.

22. From the beginning of the dinner, Barnes was acting inappropriately and making unwanted remarks of a sexual nature and making unwanted physical contact of a sexual nature towards Paige including but not limited to continually telling Paige he wanted to have sexual intercourse with her, stating that he wanted to have children with her, and continually touching Paige under the table, all of which was witnessed by Cole.

23. On the plane back from New York City to Indianapolis, Paige informed Cole that the unwanted sexual remarks and physical contact of a sexual nature he had witnessed Barnes display towards Paige at dinner the night before was not the first time Barnes had sexually harassed her, but reported to Cole the previous August 2018 incident.

24. In October 2018, Paige came forward and reported the August 2018 and September 2018 incidents of sexual harassment to a co-worker on a different team at Milliman, and this Milliman employee was further informed of many situations in which Barnes made unwanted sexual remarks and physical contact of a sexual nature towards Paige as they happened.

25. Beginning in October 2018, Paige was no longer allowed to travel for projects, she was continually denied to travel for projects she was currently working on and some projects she was in fact in charge of, and was continually denied any new projects that came into Milliman.

26. In December 2018, Barnes began removing Paige from multiple important projects that she had been working on, and again refused to involve her in new projects.

27. Barnes and Matt Berman (hereinafter "Berman"), a Milliman Consultant, informed Paige that Anne Jackson (hereinafter "Jackson"), an Equity Principals who oversaw Barnes' department, wanted her off a project because she was spending too much time on the project, but after following up with Jackson, Paige was told by Jackson that this was untrue, and asked Paige to follow up with Barnes and Berman as to why they claimed this. This incident was not resolved and no solution resulted, as none of Paige's managers would agree on what occurred.

28. In February 2019, Barnes approached Paige, raised his voice and berated her about "what she had been wasting her time on all day" and "why hadn't she finished the project," not understanding the breadth of the project's requirements or that Paige had been working on this project for the entirety of the day.

29. Barnes actions of removing Paige from multiple projects in October 2018 and December 2018, his repeated lies about Paige's performance to Jackson, and his treatment of Paige in multiple meetings and in front of co-workers, including the February 2019 hostile and abusive interaction, were in retaliation to Paige not entertaining Barnes' sexual advances in August 2018 and September 2018 and placed Paige in imminent fear of further retaliation if she came forward.

30. During the time of the sexual harassment Paige endured from Barnes, her supervisor, from April 2018 to February 2019, there was no employee in the Indianapolis office that was working in a Human Resources role, there was no one in place at Milliman for Paige to come forward to, all that she had at her disposal was a general email, HR@milliman.com, of which Paige was not comfortable emailing her allegations of sexual harassment against her direct supervisor to.

31. The only individual Paige could come forward to, other than co-workers, was her direct supervisor, Barnes, who was sexually harassing her, controlled her continued employment, her bonuses and raises, the upward growth she would have at Milliman, and the work that she was given to do or brought into.

32. In April 2019, Paige again informed two employees on her own team of Barnes' sexual harassment occurrences towards her when traveling with him in August 2018 and September 2018.

33. In April 2019, Barnes again retaliated against Paige when she requested a pay increase during her annual review with Jackson but was denied any raise because of her performance reviews from Barnes. This was the first time Paige had received any negative feedback as to her performance.

34. During this time in April 2019 and July 2019, Barnes refused to work with Paige and do his portion of the projects which he had agreed with Jackson to be a part of, and further continued to be unwilling to do his part of other projects Paige was working on.

35. In November 2019, Jay Kilgore (hereinafter "Kilgore") was hired at Milliman as the Human Resources Business Partner for Milliman's Indianapolis Office.

36. In November 2019, Paige became aware of other young women who had similarly been sexually harassed by Barnes, and also learned that Barnes' behavior had previously been reported to managers and owners at Milliman in 2016, yet nothing was done to stop his behavior, and when these other women had come forward and reported allegations of sexual harassment, Barnes was merely moved to a different team within the company.

37. The allegations of sexual harassment by Barnes were reported in 2016 by two employees to former Equity Principal, Art Wilmes, one of three Equity Principals at Milliman at that time.

38. The two employees reported allegations of sexual harassment by Barnes and another Milliman supervisor, David Pierce (hereinafter "Pierce"), who upon finding out about the allegations coming forward, resigned from Milliman immediately, but Barnes however was moved to the Pharmaceutical team and would become Paige's direct supervisor.

39. In December 2019, Paige and two other woman made the choice to come forward and tell human resources about how they had been sexually harassed by Barnes.

40. On or about December 7, 2019, Paige talked to Kilgore about Barnes' sexual harassing conduct.

41. On or about December 11 and 12, 2018, Kilgore met with Paige again to discuss the allegations of sexual harassment by Barnes.

42. On or about December 12 and 13, 2018, Kilgore met with the two other female employees who had previously been sexually harassed by Barnes in 2016, who both remained employed at Milliman after Barnes was moved to the Pharmaceutical team in which the two female employees did not work in.

43. On or about December 16, 2019, Kilgore met with Jackson and another Indianapolis Equity Principal, Rob Damler, to report on his meeting with Paige and the other two female employees regarding the sexual harassment allegations against Barnes.

44. On or about December 17, 2019, the Equity Principals terminated Barnes employment.

45. Following Barnes' termination, Paige's supervisors at Milliman continued to retaliate against her, holding her responsible for Barnes losing his job, and this retaliation Paige experienced since Barnes' termination continued to create a hostile work environment.

46. In January 2020, Paige received what Milliman called a promotion, but was in reality a demotion.

47. While there was a pay increase when Paige accepted the new position, the new pay amount Paige would earn was the same amount that other, less experienced employees with less responsibilities were making.

48. Paige's new position at Milliman in January 2020, included removing most of her previous responsibilities, diminishing her role at Milliman to taking notes for other employees in meetings, writing other employee's emails to send to Paige's former clients, and having

accounts she had previously been solely responsible for taken away from her and reassigned to other employees.

49. Paige's new position was a downgrade from her previous position which included leading client meetings, traveling to see clients, coming up with marketing campaigns for clients, working and managing projects, timelines, and vendors.

50. Paige lost any amount of autonomy her position previously had before she came forward about Barnes' sexual advances and harassment.

51. On or about February 9, 2020, Paige submitted her resignation of employment to Jackson via email.

## V. LEGAL ALLEGATIONS

### 1. Sexual Harassment and Sexually Hostile Work Environment

52. Paige hereby incorporates paragraphs one (1) through (51) as set forth herein.

53. Paige was sexually harassed by Andy Barnes, Milliman Consultant and her direct supervisor, because of her sex, female.

54. The sexual harassment subjected Paige to a hostile work environment that was sufficiently severe or pervasive to alter the conditions of her employment and to create an abusive working environment.

55. The harassment was sufficiently severe or pervasive that it altered the conditions of Paige's employment and created an intimidating, hostile, offensive, and abusive working environment.

56. Milliman failed to take reasonable steps to prevent the harassment once it knew, or should have known, of the reasonable probability that the harassment would occur.

57. Milliman's failure to discover or prevent the harassment gave rise to a hostile work environment.

58. Milliman failed to remedy or prevent a hostile or offensive work environment of which it knew, or should have known.

### 2. Negligence of Milliman – Unreasonably Responding to Serial Harasser

59. Paige hereby incorporates paragraphs one (1) through (58) as set forth herein.

60. Milliman's own acts or omission in responding unreasonably to the allegations of sexual harassment against Barnes manifested indifference or unreasonableness in light of the facts Milliman knew or should have known.

61. Milliman failed to warn other employees based on its direct knowledge or constructive knowledge of Barnes prior acts and inappropriate behavior.

62. Milliman failed to adequately supervise Barnes after Milliman had direct or constructive knowledge of past complaints.

63. Milliman's responsibility to prevent future harassment is heightened where it is dealing with a known serial harasser, such as Barnes, and is therefore on clear notice that the same employee engaged in inappropriate behavior in the past.

64. Milliman's failure to investigate Barnes' previous incidents of sexual harassment or to take reasonable steps designed to prevent future harassment manifested indifference or unreasonableness in light of the facts Milliman knew or should have known, given the fact that Milliman management and owners knew or should have known that Barnes had previously harassed other female employees.

65. Milliman failed to take any corrective action reasonably calculated to end Barnes' pattern of harassment such as warning him that sexual harassment would not be tolerated or

monitoring his behavior to ensure that he did not sexually harass either Paige, or other woman at Milliman.

66. Milliman's transfer of Barnes to a new department is insufficient as a corrective action to preclude liability, but in light of the fact that Milliman failed to monitor Barnes' behavior to prevent future harassment, shows a failure by Milliman to fulfill its duty to act on complaints of a serial harasser, and further allowed the known harasser, Barnes, to continue to injure new victims, such as Paige.

### 3. Retaliation

67. Paige hereby incorporates paragraphs one (1) through (66) as set forth herein.

68. From October 2018 to February 2019, after Paige continually denied Barnes' sexual advances, Barnes retaliated against Paige by removing her from multiple projects she had been working on, told repeated lies about Paige's performance to Equity Principal Anne Jackson, refused to work on projects with Paige that he had previously agreed to work on, Paige was denied to travel for projects she had been working on and in charge of, was inappropriately treated in multiple meetings and in front of co-workers by Barnes including the February 2019 hostile and abusive interaction directed to Paige by Barnes, and was continually denied by Barnes to work on any new projects that came into Milliman.

69. Following Barnes' termination in December 2019, Paige's supervisor at Milliman also continued to retaliate against her, holding her responsible for Barnes losing his job.

70. In January 2020, Milliman further retaliated against Paige by disguising a new position as a promotion but in fact removed most of her previous responsibilities, diminished her role at Milliman to taking notes for other employees in meetings and sending emails for other

employees to Paige's former clients, and having accounts she had previously been solely responsible for taken away from her and assigned to other employees.

71. Based on the foregoing, it is Paige's position that she was continually retaliated against since denying Barnes' sexual advances, following Barnes' termination and since she filed her Charge for Discrimination.

72. As a result of Milliman's actions, Paige has sustained damages including but not limited to economic loss, loss of reputation, loss of enjoyment of life, mental anguish and emotional injury.

73. Milliman's actions and omissions violated Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* as amended.

## VI.  REQUESTED RELIEF

WHEREFORE the Plaintiff, Paige Bova, requests that judgment of this Court be held in her favor as follows:

1. Order Milliman to pay Paige any and all lost wages and the monetary value of all benefits associated with her employment;

2. Order Milliman to pay Paige compensatory damages for the mental anguish and consequential harm she suffered;

3. Order Milliman to pay Paige's reasonable attorney fees and costs;

4. Order Milliman to pay interest on all sums recoverable; and

5. Award to Paige all other relief that is just and proper.

Respectfully submitted,

GOODIN ABERNATHY, LLP

/s/ Christopher E. Clark
Christopher E. Clark, #18577-29

*Attorney for Plaintiff*

## **DEMAND FOR JURY TRIAL**

Plaintiff, Paige Bova, by counsel, demands a trial by jury on all issues deemed so triable.

        Respectfully submitted,

        GOODIN ABERNATHY, LLP

        /s/ Christopher E. Clark
        Christopher E. Clark, #18577-29
        *Attorney for Plaintiff*

GOODIN ABERNATHY, LLP
301 East 38th Street
Indianapolis, IN 46205
P: 317/843-2606
F: 317/574-3095
cclark@goodinabernathy.com
03-108